# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **JEREMY MINOR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 3:19-CV-01631-CLS** |
| | ) | |
| **CENTRAL FOREST PRODUCTS,** | ) | |
| **INC., and TRAVIS BROWN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Plaintiff, Jeremy Minor, formerly worked as a mechanic and general handyman for defendant Central Forest Products, Inc., and its sole owner, defendant Travis Brown. Plaintiff alleges that he often worked more than forty hours a week, but was never paid overtime wages. Generally, an employee's maximum hours of work and his entitlement to overtime wages are regulated by the Wage and Hour Division of the United States Department of Labor through the Fair Labor Standards Act of 1938. For certain types of employees, however, maximum hours of work are regulated by the Secretary of the United States Department of Transportation under the Motor Carrier Act of 1935. Those employees are not entitled to overtime wages under the FLSA. *Compare* 29 U.S.C. § 213(b)(1) *with* 49 U.S.C. § 31502. The determinative issue in this case, therefore, is whether plaintiff's maximum work hours were

regulated by the Department of Labor, or by the Department of Transportation.  That issue is before the court on the parties' cross-motions for summary judgment.[1]

## I.  RELEVANT FACTS

Defendants Central Forest Products, Inc., and its sole owner, Travis Brown, were engaged in logging operations:  *that is*, they were in the business of cutting, processing, and transporting for compensation trees from Tennessee forests owned by third parties.  After defendants' employees felled the trees, they were topped at the stump, "delimbed," and cut into uniform lengths that would fit "wood trailers."[2]  The cut logs were then loaded into wood trailers with a "knuckleboom."[3]  The loaded trailers were initially attached to large, heavy vehicles known as "pullout trucks," which were used to pull the loaded wood trailers over unpaved logging roads to

---

[1] *See* doc. no. 41 (Defendants' Motion for Summary Judgment); doc. no. 42 (Defendants' Brief in Support of Motion for Summary Judgment); doc. no. 43 (Defendants' Evidentiary Submission in Support of Summary Judgment).  *See also* doc. no. 44 (Plaintiff's Motion for Summary Judgment); doc. no. 45 (Plaintiff's Brief in Support of Motion for Summary Judgment); doc. no. 46 (Plaintiff's Evidentiary Submission in Support of Summary Judgment).

Defendants also have asserted a counterclaim for breach of contract, alleging that plaintiff violated an agreement to pay defendants part of the rate he charged third parties for work he performed in defendants' shop, using defendants' tools.  *See* doc. no. 6 (Answer and Counterclaim), at 5-6.  That counterclaim is not at issue in the cross-motions for summary judgment discussed in this opinion.

[2] *See* doc. no. 53-1 (Plaintiff's Exhibit 1 - Travis Brown Deposition), at 122, 128.  The trees were not debarked or cut into lumber before loading.

[3] *See* doc. no. 43 (Defendants' Exhibit A - Travis Brown Affidavit), ¶¶ 4-5.  The cut timbers were loaded carefully, so that the wood trailers were not off-balance, the logs did not protrude too far from the rear of the wood trailers, and did not fall off while on public highways.  *Id.* ¶ 6.

staging areas near a public highway.[4]  There, the trailers were disconnected from the pullout trucks and hitched to different, large diesel-powered "road trucks" which were used to pull the loaded wood trailers over public highways to sawmills in Alabama, Mississippi, or Tennessee, at which the logs were cut into boards, or ground into pulp for paper.[5]

Notably, the defendants did not own any of the trees harvested by its employees.  Instead, defendants were compensated by third-party owners of the forests for felling the trees, topping and removing the limbs of each at the stump, cutting them to uniform lengths, loading the logs onto wood trailers, and hauling the harvest to sawmills.[6]  Even though defendants owned none of the harvested timbers, they owned all of the equipment, trucks, and trailers used to cut, trim, load, and transport the timber from forests to mills.[7]  The third-party owners of the harvested timbers designated the sawmills to which the harvest was to be transported.[8]  Some

---

[4] *Id.* ¶¶ 7-8.

[5] *Id.* ¶¶ 9-12.

[6] *Id*. ¶ 13.

[7] The exact number of trucks and trailers owned by defendants is disputed.  Defendants contend that, during the relevant time period, the company owned five or six road trucks, three or four pullout trucks, and eighteen wood trailers.  *See id.* ¶ 18.  Plaintiff points to insurance documents from that same timeframe to assert that defendants never owned more than fifteen wood trailers and five total trucks, including both road and pullout trucks.  *See* doc. no. 53-2 (Plaintiff's Exhibit 2); doc. no. 53-3 (Plaintiff's Exhibit 3); doc. no. 53-4 (Plaintiff's Exhibit 4); *see also* doc. no. 53-1 (Plaintiff's Exhibit 1 - Travis Brown Deposition), at 33.

[8] *See* doc. no. 43 (Defendants' Exhibit A - Travis Brown Affidavit), ¶ 11.  *See also id.* ¶ 3 (stating trees are owned by Threshold; *but see* doc. no. 53-1 (Plaintiff's Exhibit 1 - Travis Brown

of the cuttings were transported from the Tennessee forests in which the trees were felled to mills in Alabama or Mississippi; some cuttings were hauled from a Tennessee forest to a mill in that same state, but only after driving over public highways passing through a portion of northern Alabama; and, some cuttings were transported from Tennessee forests to Tennessee mills, without ever leaving that state.[9]

## A.    Plaintiff's Work for Defendants

Plaintiff, Jeremy Minor, worked for defendants for slightly more than three years, from the end of March 2016 until May 14, 2019.[10]  During the initial thirteen months of that period, he was paid as an independent contractor.[11]  Around April 27, 2017, however, he asked defendant Travis Brown to begin deducting income taxes and insurance premiums from his pay check.  In order to accommodate those requests, plaintiff was reclassified as an "employee" of defendants.[12]

From September 2016 until July 7, 2018, plaintiff was compensated at the rate

Deposition), at 14 (stating trees are owned by TRG Timberland).

[9] *See* doc. no. 43 (Defendants' Exhibit A - Travis Brown Affidavit), ¶ 11.

[10] *See* doc. no. 46-1 (Plaintiff's Exhibit A - Jeremy Minor Deposition), at 11 ("**Q.**  And the last period of time that you worked for Central Forest Products ended on May 14th of 2019, right?  **A.**  Yes, sir."); *id.* at 17 ("**Q.**  Okay.  So you would have started work sometime in the last week of March of 2016; right?  . . .  **A.**  Yes, sir."); *see also* doc. no. 43 (Defendants' Exhibit A - Travis Brown Affidavit), ¶ 20 ("Jeremy's last period of work started around March 29, 2016, and continued until May 14, 2019.").

[11] *Id.* at 197-206.

[12] *Id.* at 20-21, 206-09.

of $22.50 an hour,[13] regardless of whether his status was that of an independent contractor or an employee.

From July 8, 2018 until December 2018 — during all of which plaintiff was classified as an employee — he was paid $25 an hour.[14]

Even though plaintiff sometimes worked more than forty hours in a week, he never received overtime pay at the rate of one-and-one-half-times his regular hourly rate of pay:  *that is*, $33.75 for each overtime hour worked during weeks prior to (and through) July 7, 2018;[15] and, $37.50 for each overtime hour after July 8, 2018.[16]

The overtime pay plaintiff allegedly was owed from April 27, 2017 (the date on which he was reclassified as an "employee") through the end of December 2017 (when his records end) is approximately $4,007.85.[17]  Plaintiff maintained a primitive time log of his work activities at the beginning of his relationship with defendants, when he was being paid as an independent contractor, but he ceased to record and describe the nature of his work on April 27, 2017:  the date on which he was

---

[13] *Id.* at 28.

[14] *Id.* at 29-30.  Plaintiff claims that he does not recall receiving that raise.  *Id.*

[15] $22.50 + $11.25 = $33.75 an hour overtime.

[16] $25.00 + $12.50 = $37.50 an hour overtime.  Doc. no. 6 (Answer and Counterclaim), ¶ 17 (admitting that plaintiff sometimes worked more than forty hours a week); *id.* ¶ 19 (admitting defendants did not pay plaintiff an overtime wage because he was not entitled to one).  *See also* doc. no. 53-1 (Plaintiff's Exhibit 1 - Travis Brown Deposition), at 135.

[17] The court reviewed the time records in doc. no. 58-2 (Plaintiff's Exhibit L), and multiplied all hours over forty by $11.25 (the additional pay for each hour that plaintiff did not receive), and found the amount of unpaid overtime for that time period to be $4,007.85.

reclassified as an "employee."[18]  Neither plaintiff nor defendants produced records reflecting plaintiff's work hours for the sixteen-and-a-half-month period from January 1, 2018 through May 14, 2019:  the date on which plaintiff quit his job.[19]

Plaintiff first broached the overtime pay issue with defendant Travis Brown during the week before Christmas in 2018.  According to plaintiff, he approached Brown and said that his "tax person had let [him] know that [he] was supposed to be getting paid overtime."[20]  "Well," Brown allegedly responded, "I was wondering when this issue was going to come up."[21]  Plaintiff accused Brown of knowing that he was required to pay him overtime, but Brown did not respond to the accusation.[22]

Travis Brown never agreed to pay plaintiff one-and-a-half times his regularly hourly pay for his overtime hours.  Instead, Brown changed the manner in which plaintiff was compensated, paying him according to a formula rather than at an hourly rate:  that is, plaintiff was paid either $250 a day, or the daily amount paid to defendants' "Big Crew" (*i.e.*, those employees responsible for harvesting and loading

---

[18] *Compare* doc. no. 58-1 (Plaintiff's Exhibit K - Time Log) *with* doc. no. 58-2 (Plaintiff's Exhibit L - Time Log).

[19] *See* doc. no. 46-1 (Plaintiff's Exhibit A - Jeremy Minor Deposition), at 366.

[20] *Id.* at 33 (alterations supplied).

[21] *Id.*

[22] *Id.*

felled trees[23]), whichever amount was the greatest.[24]   Plaintiff was aware at the time

of the change that the "Big Crew" did not receive overtime pay.[25]

     Plaintiff continued to work under that arrangement for several months, but one

day when Brown asked plaintiff to work late,[26] plaintiff refused, saying:  "Well, you

ain't paying me overtime.  I'm gone."[27]   Brown later called plaintiff and allegedly

"begged" him to return to work, and he did.[28]

     The two men did not discuss overtime pay again until May 14, 2019:  the date

on which plaintiff quit his job.[29]   Brown called plaintiff at around 6:45 a.m. that

morning and asked when he intended to arrive for work.  Plaintiff told Brown that he

was about to pull into the shop.  "Well," Brown responded, "you was supposed to

leave with the other hands . . . . to be up there in the woods this morning."[30]   Plaintiff

rebelled, saying:  "No, if you're not going to pay me overtime I'm not going to leave

---

[23] *Id.* at 31.

[24] *Id.* at 37-42.  Minor contends that he felt pressured into changing the manner in which his pay was calculated.  *Id.* at 38-39 ("**Q.**  . . . So you didn't make any kind of agreement with Mr. Brown to change your pay from a fixed hourly amount to the formula pay?  **A.**  I mean . . . it was put that either he was going to change the way I was paid to this or . . .  I took it as I would lose my job.").

[25] *See* doc. no. 46-1 (Plaintiff's Exhibit A - Jeremy Minor Deposition), at 39-40 ("**Q.**  Were you aware at the time that you claim Travis made this statement to you that the Big Crew did not get paid overtime?  **A.**  Yes, sir.").

[26] *Id.* at 365 ("I don't have a clue what the date was . . . .").

[27] *Id.*

[28] *Id.* at 365-66.

[29] *Id.* at 366.

[30] *Id.* at 12-13 (ellipsis supplied).

early.  I'm not going to stay late no more."[31]  Plaintiff pulled up to the shop,

confronted Brown, demanded that he be paid overtime, and threatened once more to

quit.[32]  When Brown said that he would not compensate plaintiff for overtime hours,

plaintiff removed his tools from defendants' shop, left the building, and quit his job.[33]

## B.    The Character of the Work Performed by Plaintiff

Plaintiff testified that the character of the work he performed for defendants

tended to change on a daily basis.[34]  In his words, he "had no typical job."[35]  Instead,

he performed odd jobs, including:  hanging signs;[36] repairing equipment;[37] running

air ducts inside defendants' shop;[38] servicing, "greasing," and repairing the pullout

trucks, road trucks, and wood trailers;[39] and, sometimes, loading harvested logs into

---

[31] Doc. no. 46-1 (Plaintiff's Exhibit A - Jeremy Minor Deposition), at 13.

[32] *Id.*

[33] *Id.* at 13-14.

[34] *Id.* at 48-49.

[35] *Id.* at 112.

[36] *See, e.g.*, doc. no. 58-1 (Plaintiff's Exhibit K - Time Log), at 5, 7-8.

[37] *See, e.g., id.* at 9 ("worked on skidder"); *id.* at 11 (same).

[38] *See, e.g., id.* at 30, 34; doc. no. 46-1 (Plaintiff's Exhibit A - Jeremy Minor Deposition), at 163-64 ("Where it says (reading) Worked on air lines.  Because I run all the air lines inside his new shop.").

[39] *See* doc. no. 43 (Defendants' Exhibit A - Travis Brown Affidavit), ¶ 21; doc. no. 46-1 (Plaintiff's Exhibit A - Jeremy Minor Deposition), at 64-72, 81, 88-89, 104-05, 115-17, 119-26, 136-74, 178-79, 244-47, 322-23, 344-47; doc. no. 43-8 (Defendants' Exhibit G - Bill Ragan Affidavit), ¶¶ 5-9 (stating that 80-90% of the work he and Minor did together involved maintenance on the road or pullout trucks, and that they serviced the trucks once a week); doc. no. 58-1 (Plaintiff's Exhibit K - Time Log), at 7-44 (noting that Minor had, among other things, changed tires on trucks and trailers, replaced brake chambers on trailers, fixed air leaks on one of the road trucks, and fixed air bags in a road truck).

road trailers.[40]  In plaintiff's opinion, less than ten percent of his work was related, directly or indirectly, to defendants' logging operations in Tennessee forests,[41] and less than 5% involved loading harvested logs onto road trailers.[42]  Instead, plaintiff estimated that 60% to 70% of his time was spent in the performance of mechanic's work,[43] and that less than 5% of that time was devoted to servicing or repairing road trucks or wood trailers.[44]  He never drove the road trucks on a public highway when they were hitched to loaded wood trailers.[45]  And, he used defendants' shop to perform work on the company's trucks, trailers, and equipment, as well as vehicles and equipment owned by third parties.[46]

In contrast, plaintiff's coworkers estimated that he spent at least 50% of his time performing mechanic's work on road trucks and wood trailers, and that at least

---

[40] *See* doc. no. 43 (Defendants' Exhibit A - Travis Brown Affidavit), ¶¶ 6, 24; doc. no. 46-1 (Plaintiff's Exhibit A - Jeremy Minor Deposition), at 49-50, 86-87, 112-14, 164-65, 245-46, 320-21; doc. no. 43-9 (Defendants' Exhibit H - Trent Anthony Affidavit), ¶ 10.

[41] *See* doc. no. 46-1 (Plaintiff's Exhibit A - Jeremy Minor Deposition), at 49-50.

[42] *See id.* at 50; *see also id.* at 113-14 (estimating that he spent maybe ten days per year loading wood); *id.* at 164-65 (noting that he was paid for loading wood the week of December 25, 2016); doc. no. 58-1 (Plaintiff's Exhibit K - Time Log), at 31 (recording pay for loads of wood).

[43] *See* doc. no. 46-1 (Plaintiff's Exhibit A - Jeremy Minor Deposition), at 53-54.

[44] *Id.* at 54.  The court infers from plaintiff's testimony that his remaining time of mechanic's work was spent on logging equipment, like "skidders" and "knucklebooms."  *Id.* at 63 (describing himself as more of an equipment mechanic than Bill Ragan).

[45] *Id.* at 52-53.  He stated that he drove an unloaded road truck, maybe once or twice, in order to test it or to deliver a trailer to a harvesting site.  *Id.* at 51-52.

[46] *Id.* at 215-16.  The payment arrangement for plaintiff's work for third parties is disputed, and is the subject of defendants' counterclaim.  *See also id.* at 215-25, and doc. no. 6 (Answer and Counterclaim).

25% of that work affected the safety of those vehicles.[47]

Plaintiff sometimes worked with another mechanic named Bill Ragan, who was employed by defendants on an "as needed" basis during nights and on weekends from April 2016 through the end of June 2017.[48]   According to plaintiff, Ragan's mechanic's work was limited to trucks and trailers, while plaintiff was more experienced as a mechanic working on the logging equipment, like "skidders,"[49] "loaders,"[50] or "knucklebooms."[51]   Ragan executed an affidavit that contradicts plaintiff's testimony, however, and avers that approximately half of the work he performed for defendants was done with plaintiff, and that either he or plaintiff "greased" the road trucks nearly every week.[52]   (Plaintiff admitted that, when defendants' road trucks were brought into the shop for "greasing," he changed the oil

---

[47] *See* doc. no. 43-9 (Defendants' Exhibit H - Trent Anthony Affidavit), ¶¶ 7-8.

[48] *See* doc. no. 46-1 (Plaintiff's Exhibit A - Jeremy Minor Deposition), at 56-57; *see also* doc. no. 43-8 (Defendants' Exhibit G - Bill Ragan Affidavit), ¶ 2.

[49] *See, e.g.*, doc. no. 58-1 (Plaintiff's Exhibit K - Time Log), at 13 ("worked on skidders"). "A skidder drags material from the woods to a landing or roadside."  Skidders, U.S. Forest Service, https://www.fs.fed.us/forestmanagement/equipment-catalog/skidders.shtml.

[50] *See, e.g.*, doc. no. 58-1 (Plaintiff's Exhibit K - Time Logs), at 13 ("worked on loader"). A loader is used to stack logs into piles, then load them onto a wood trailer.  *See* Log Loaders, U.S. Forest Service, https://www.fs.fed.us/forestmanagement/equipment-catalog/logloaders.shtml. "Knucklebooms" are a type of loader.  *See id.*

[51] *See* doc. no. 46-1 (Plaintiff's Exhibit A - Jeremy Minor Deposition), at 62-64; *see also id.* at 249 ("**Q.**  So when Bill Ragan wasn't there and there was a problem with a road truck or a wood trailer or whatever, basically were you the person that diagnosed it and determined how to fix it and what was needed to be done?  **A.**  It was rare but I mean I did do a few jobs like that, yeah.").

[52] *See* doc. no. 43-8 (Defendants' Exhibit G - Bill Ragan Affidavit), ¶¶ 5, 8.

and checked the tires.[53])

Bill Ragan also testified that plaintiff, on occasion, assisted him in performing the annual inspections required by the Department of Transportation.[54]  Despite the fact that plaintiff's signature appears on some of the forms required by the Department of Transportation, he maintained that he never performed annual inspections on the trucks or trailers.[55]

Plaintiff sometimes worked on or drove smaller trucks that weighed 10,000 pounds or less.[56]  He testified that he never used those trucks to transport passengers across state lines, but that he sometimes employed them to haul property,[57] including "skidder" tires picked up in Tennessee and carried back to Alabama.[58]  In any event,

---

[53] *See* doc. no. 46-1 (Plaintiff's Exhibit A - Jeremy Minor Deposition), at 65-69; *see also id.* at 119-24 (explaining the types of things he checked for when he "greased" a truck or trailer).

[54] *See* doc. no. 43-8 (Defendants' Exhibit G - Bill Ragan Affidavit), ¶ 9.

[55] Doc. no. 46-1 (Plaintiff's Exhibit A - Jeremy Minor Deposition), at 124 ("I don't remember doing a DOT inspection for Travis Brown."); *id.* at 129 (same); *id.* at 189 (same); *id.* at 344-45 (same).

[56] *Id.* at 95; doc. no. 53-1 (Plaintiff's Exhibit 1 - Travis Brown Deposition), at 100-02 (stating that Minor may have worked on the silver Toyota Tacoma once or twice and confirming it weighed less than 10,000 pounds); *see also* doc. no. 53-11 (Plaintiff's Exhibit 11 - Plaintiff's Responses and Supplemented Responses to Defendant's Second Interrogatories), at 3-4, 10-12.

[57] *See* doc. no. 46-1 (Plaintiff's Exhibit A - Jeremy Minor Deposition), at 95-97 (plaintiff recalled that he used a white Dodge 3500 to pull a gooseneck trailer to haul hay and other things); *id.* at 108-09 (stating that defendants' four Toyota Tacomas were never used to haul passengers across state lines); *id.* at 154, 158 (confirming that he traveled to B & G in Mississippi to pick up parts); *id.* at 240 (stating that he sometimes used the Dodge 3500 to haul hay, other trucks, and small buildings).

[58] "A skidder drags material from the woods to a landing or roadside."  Skidders, U.S. Forest Service, https://www.fs.fed.us/forestmanagement/equipment-catalog/skidders.shtml.

none of the smaller trucks were used to transport property across state lines for anyone other than defendants.[59]

## II.  SUMMARY JUDGMENT STANDARDS

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation."  *Daniels v. Twin Oaks Nursing Home*, 692 F.2d

---

[59] *See* doc. no. 43 (Defendants' Exhibit A - Travis Brown Affidavit), ¶¶ 26-28; doc. no. 46-1 (Plaintiff's Exhibit A - Jeremy Minor Deposition), at 84-86, 95-99, 331, 341; *id.* at 109 (stating that the four Toyota Tacomas were never used to haul property across state lines).

1321, 1324 (11th Cir. 1983) (alterations supplied).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied).  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.").

> "The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed."  [*South*] *Pilot* [*Insurance*] *Co. v.CECS, Inc.*, 52 F. Supp. 3d 1240, 1242-43 (N.D. Ga. 2014) (citing [*American*] *Bankers* [*Insurance*] *Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005)).  "The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration."  *Id.*  "The Eleventh Circuit has explained that '[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed.'"  *Id.* (quoting *United States v. Oakley*, F.2d 1553, 1555 (11th Cir. 1984)).  "Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts."  *Id.* (quoting *Oakley*, 744 F.2d at 1555-56).

*Alabama Municipal Insurance Corp. v. Scottsdale Insurance Co.*, 297 F. Supp. 3d 1248, 1252 (N.D. Ala. 2017) (citation alterations supplied, other alterations in original).

### III. DISCUSSION

Congress enacted the Fair Labor Standards Act ("FLSA") on June 25, 1938,[60] for the purpose, among others stated, of establishing a minimum hourly wage for persons employed in interstate commerce, or in the production of goods for interstate commerce, and also defining the circumstances under which such employees were eligible to be paid overtime wages. *See generally* 29 U.S.C. § 202 (stating legislative findings and declaring Congressional policy);[61] *id*. § 206(a)(1) (defining minimum wage). A covered employee's entitlement to overtime wages is defined by 29 U.S.C. § 207, which provides that:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

---

[60] *See* Pub. L. No. 75-718, 52 Stat. 1060 (1938); 29 U.S.C. § 201.

[61] *See also*, *e.g.*, Fair Labor Standards Act (FLSA), Office of Financial Management, State of Washington, https://ofm.wa.gov/state-human-resources/compensation-job-classes/compensation-administration/fair-labor-standards-act-flsa.

29 U.S.C. § 207(a)(1).[62]

When, as here, a former employee files suit under the FLSA to recover allegedly unpaid overtime wages, the burden of proving he worked overtime without the proper compensation rests upon the plaintiff-employee. *See, e.g.*, *Allen v. Board of Public Education for Bibb County*, 495 F.3d 1306, 1314 (11th Cir. 2007).[63]

Defendants do not deny that plaintiff would have been entitled to overtime wages *if* his maximum hours requirement had been governed by the FLSA.[64] Instead, defendants contend that the maximum hours requirements of plaintiff's employment

---

[62] *See also*, *e.g.*, *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2121 (2016) (observing that FLSA Section 207(a)(1) "requires employers to pay overtime compensation to covered employees who work more than 40 hours in a given week").

[63] *See also Allen*, 495 F.3d at 1315 (reiterating that FLSA plaintiffs bear the burden of proving they worked overtime without compensation. If this case were to proceed to trial, plaintiff Jeremy Minor would be required to prove, among other facts: (1) that defendants were an "enterprise" engaged in interstate commerce; (2) the periods during which plaintiff was classified by defendants as an "employee," as opposed to an "independent contractor"; (3) all weeks during those periods when plaintiff worked more than forty hours, but was not paid overtime compensation; and (4) that defendants knew, or should have known, of plaintiff's overtime work. *See, e.g.*, 11th Circuit Pattern Jury Instruction 4.14 (2020); *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1277 n.68 (11th Cir. 2008); *Reich v. Department of Conservation and Natural Resources*, 28 F.3d 1076, 1081-82 (11th Cir. 1994); 29 C.F.R. § 785.11. If plaintiff also proved that defendants willfully violated FLSA Section 207(a)(1), plaintiff could recover unpaid overtime compensation for the three years preceding the date on which he filed suit (*i.e.*, Oct. 4, 2016 to Oct. 4, 2019), but if it is not shown that defendants willfully violated the statute, plaintiff could only recover unpaid overtime for the two-year period preceding the commencement of suit. 29 U.S.C § 255(a); *Allen*, 495 F.3d at 1323-24.

[64] Defendants admitted in their answer that: plaintiff was an "employee" for slightly more than two years, from April 27, 2017 until May 16, 2019; that he sometimes worked more than forty hours during a workweek; and, that they did not pay him overtime wages. Doc. no. 6 (Answer and Counterclaim), ¶¶ 3, 17, 22. They later amended their answer to admit that they were an "enterprise" as contemplated by 29 U.S.C. §§ 203(r) and 203(s). *See* doc. no. 28 (Defendants' Motion to Amend Answer), *and* doc. no. 29 (Order Granting Motion to Amend Answer).

were regulated by the Motor Carrier Act, and not the FLSA.[65]  The Motor Carrier Act is enforced by the Secretary of the Department of *Transportation*,[66] whereas jurisdiction over the FLSA is vested in the Wage and Hour Division of the Department of *Labor*.[67]

## A.    The Motor Carrier Act Exemption to the FLSA

Section 213 of the Fair Labor Standards Act expressly provides that the overtime wage requirements specified in Section 207 of that Act "shall not apply with respect to — (1) any employee with respect to whom the Secretary of [the Department of] *Transportation* has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49 [*i.e.*, *the Motor Carrier*

_____

[65] The Motor Carrier Act was enacted by Congress on August 9, 1935, for the purposes of promoting efficiency and safety in interstate motor transportation.  *See* Pub. L. No. 74–255, 49 Stat. 543 (1935), whereas the Fair Labor Standards Act did not become law until nearly three years later, on June 25, 1938.  See note 60, *supra*.

[66] As originally enacted, the Motor Carrier Act of 1935 empowered the Interstate Commerce Commission to "establish reasonable requirements with respect to qualifications and maximum hours of service of employees and safety of operation and equipment" of motor vehicles operating as common, contract, or private motor carriers.  *Levinson v. Spector Motor Service*, 330 U.S. 649, 658 (1947).  Thirty years later, however, Congress enacted the "Department of Transportation Act of 1966," which transferred the authority to regulate safety operations for motor vehicles under the Motor Carrier Act from the Interstate Commerce Commission to the Department of Transportation. *See* Pub. L. No. 89–670, 80 Stat. 931, 939–40, § 6(e)(6)(C) (1966); *Friedrich v. U.S. Computer Services*, 974 F.2d 409, 412 (3d Cir. 1992).  Congress abolished the Interstate Commerce Commission on January 1, 1996, and transferred many of its functions to the newly created "Surface Transportation Board," an agency within the Department of Transportation.  *See* ICC Termination Act of 1995, Pub. L. No. 104–88, § 101, 109 Stat. 803, 804 (1995); *Bilyou v. Duchess Beer Distributors, Inc.*, 300 F.3d 217, 222 n.2 (2d Cir. 2002).

[67] *See* 29 U.S.C. § 204 (creating a Wage and Hour Division within the Department of Labor, and defining the jurisdiction, duties, and responsibilities of the Division's Administrator and employees).

*Act of 1935*].”  29 U.S.C. § 213(b)(1) (alterations and emphasis supplied).

That section of the FLSA — 29 U.S.C. § 213(b)(1) — is referred to as “the Motor Carrier Act exemption to the Fair Labor Standards Act” because it exempts employees whose maximum hours would otherwise be regulated by the Secretary of *Labor* under the FLSA from the recovery of overtime wages under that Act.

In turn, 49 U.S.C. § 31502 — the statutory provision referenced in that section of the FLSA establishing the “Motor Carrier Act exemption” — authorizes the Secretary of *Transportation* to

> prescribe requirements for — (1) qualifications and maximum hours of service of employees of, and safety of operation and equipment of, *a motor carrier*; and (2) qualifications and maximum hours of service of employees of, and standards of equipment of, *a motor private carrier*, when needed to promote safety of operation.

49 U.S.C. § 31502(b) (emphasis supplied).[68]

---

[68] ***Nota bene***:  There are distinctions between the definitions of the terms “motor carrier,” as opposed to “motor private carrier.”  *Compare* 49 U.S.C. § 13102(14) (“The term ‘motor carrier’ means a person providing motor vehicle transportation for compensation.”) *with* 49 U.S.C. § 13102(15), which defines “*motor private carrier*” as follows:

> (15) Motor private carrier.— The term “motor private carrier” means a person, other than a motor carrier, transporting property by motor vehicle when—
>
> (A)   the transportation is as provided in section 13501 of this title;
>
> (B)   the person is the owner, lessee, or bailee of the property being transported; and
>
> (C)   the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.

The Motor Carrier Act applies to the modes of transportation described in 49 U.S.C. § 13501,[69] which confers jurisdiction upon the Secretary of Transportation to regulate the conveyance of property by motor carriers over public highways and between, *e.g.*, any place in one state and any place in another state, or between a place in one state and another place in that same state, but only after passing through another state. *See* 49 U.S.C. §§ 13501(1)(A) & (1)(B).[70]

## 1.    The proof required to show that the Motor Carrier Act exemption

Defendants initially described themselves as a "*motor private carrier*." Doc. no. 42 (Defendants' Brief in Support of Motion for Summary Judgment), at 13-14. However, as discussed in Part I of this opinion ("Relevant Facts"), defendants do not own the property they harvest and transport in interstate commerce. Consequently, they subsequently changed their initial assertion, and now contend that they are a "*motor carrier*." *See* doc. no. 55 (Defendants' Response in Opposition to Plaintiff's Motion for Summary Judgment), at 2-3.

[69] *See* 49 U.S.C. § 31502(a)(1) ("This section applies to transportation — (1) described in sections *13501* and 13502 of this title . . . .") (emphasis supplied).

[70] 49 U.S.C. § 13501 confers jurisdiction upon the Secretary of Transportation and the Surface Transportation Board to regulate the interstate conveyance of persons or property (or both) by motor carriers over public highways under the following circumstances:

> The Secretary [of the Department of Transportation] and the [Surface Transportation] Board have jurisdiction, as specified in this part, over transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by motor carrier —
>
> (1) between a place in — (A) a State and a place in another State; (B) a State and another place in the same State through another State; (C) the United States and a place in a territory or possession of the United States to the extent the transportation is in the United States; (D) the United States and another place in the United States through a foreign country to the extent the transportation is in the United States; or (E) the United States and a place in a foreign country to the extent the transportation is in the United States; and
>
> (2) in a reservation under the exclusive jurisdiction of the United States or on a public highway.

**to the Fair Labor Standards Act applies**

The burden of proving that the Motor Carrier Act exemption to the FLSA applies (and, thereby, precludes an employee from recovering overtime compensation under the FLSA) rests upon the employer. *E.g.*, *Walters v. American Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1226 (11th Cir. 2009) (citing *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995) (*per curiam*)). Exemptions to the FLSA should be given a fair reading. *See Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) ("Because the FLSA gives no 'textual indication' that its exemptions should be construed narrowly, there is no reason to give [them] anything other than a fair (rather than a 'narrow') interpretation.") (alteration in original).

The issue of the application of the Motor Carrier Act exemption to a particular case "depends *both* on the class to which [the] *employer* belongs *and* on the class of work involved in *the employee's* job." 29 C.F.R. § 782.2(a) (emphasis and alteration supplied). Thus, defendants have the burden of proving two *prima facie* prerequisites.

*First*, they must prove that during plaintiff's employment they were classified as a "motor carrier" subject to the jurisdiction of the Secretary of Transportation under the Motor Carrier Act. *See*, *e.g.*, *Baez v. Wells Fargo Armored Service Corp.*, 938 F.2d 180, 181-82 (11th Cir. 1991) (*per curiam*).

19

*Second*, if defendants satisfy that element of proof, they then must demonstrate that plaintiff was engaged in work activities of a character that directly affected the safety of the operation of motor vehicles transporting property in interstate commerce over the public highways. *See* 29 C.F.R. § 782.2(a);[71] *Baez*, 938 F.2d at 182.

        a.     **First *prima facie* element**:  *Were defendants classified as a "motor carrier" subject to the jurisdiction of the Secretary of Transportation?*

"The term '*motor carrier*' means a person [or company] providing *motor vehicle* transportation for compensation."  49 U.S.C. § 13102(14) (emphasis and alteration supplied).[72]  The "motor vehicles" that are embraced within the definition

---

[71] 29 C.F.R. § 782.2 provides that the power of the Secretary of Transportation to establish maximum hours and qualifications of service for employees of a "motor carrier" under the Motor Carrier Act exemption to the FLSA

> extends to those classes of employees *and those only* who:  (1) Are employed by carriers whose transportation of passengers or property by motor vehicle is subject to his jurisdiction under section 204 of the Motor Carrier Act [now codified at 49 U.S.C. § 31502] (*Boutell v. Walling*, 327 U.S. 463 [(1946)]; *Walling v.* [*John J. Casale, Inc.*], 51 F. Supp. 520 [(S.D. N.Y. 1943)]; and see Ex parte Nos. MC–2 and MC–3, in the Matter of Maximum Hours of Service of Motor Carrier Employees, 28 M.C.C. 125, 132), and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act.  *United States v. American Trucking* [*Associations*], 310 U.S. 534 [(1940)]; *Levinson v. Spector Motor Service*, 330 U.S. 649 [(1947)]; Ex parte No. MC–28, 13 M.C.C. 481; Ex parte Nos. MC–2 and MC–3, 28  M.C.C. 125; *Walling v. Comet Carriers*, [151 F.2d 107 (2d Cir. 1945)]).

29 C.F.R. § 782.2(a) (emphasis and alterations supplied).

[72] See note 68 and related text, *supra*, discussing the distinctions between the terms "motor carrier" and "motor private carrier."

of "motor carriers" include

> a vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway in transportation, or a combination determined by the Secretary, but does not include a vehicle, locomotive, or car operated only on a rail, or a trolley bus operated by electric power from a fixed overhead wire, and providing local passenger transportation similar to street-railway service.

49 U.S.C. § 13102(16).

The undisputed facts show that defendants provided, for compensation, "motor vehicles" to transport logs owned by others, but which defendants had harvested from forests in Tennessee and conveyed over public highways to sawmills in Alabama, Mississippi, or Tennessee — sometimes without leaving Tennessee, but on other occasions after driving over roads passing through a portion of northern Alabama.[73]

Defendants estimate that only twenty-five percent of the wood their employees harvested was transported to a mill in Alabama or Mississippi or to a mill in Tennessee after passing through Alabama.[74]  Nevertheless, the Supreme Court has held that, even when transportation in interstate commerce constitutes only three or four percent of a motor carrier's business, the Secretary of Transportation has the authority to establish qualifications and maximum hours of service with respect to all of that motor carrier's full-time drivers and mechanics.  *See Morris v. McComb*, 332

---

[73] *See* doc. no. 43 (Defendants' Exhibit A - Travis Brown Affidavit), ¶ 11; and note 70, *supra*, and related text (discussing 49 U.S.C. §§ 13501(1)(A) & (1)(B)).

[74] *See* doc. no. 43 (Defendants' Exhibit A - Travis Brown Affidavit), ¶ 11.

U.S. 422, 423-24 (1947).  Accordingly, it is clear that defendants met the standard definition of a "motor carrier" subject to the jurisdiction of the Secretary of Transportation during all periods that plaintiff was their "employee."

> ***i.***    *Plaintiff's contention that the "agricultural or horticultural product" limitation divests the Secretary of Transportation of jurisdiction over defendants*

Nevertheless, plaintiff contends that Congress divested the Secretary of Transportation of jurisdiction over motor carriers like defendants when enacting 49 U.S.C. § 13506(a)(6)(B), which deprives the Secretary of Transportation of "jurisdiction *under this part* over . . .  transportation by *motor vehicle* of . . . agricultural or horticultural commodities (other than manufactured products thereof)." 49 U.S.C. § 13506(a)(6)(B) (emphasis and ellipses supplied).

Felled trees that have been "Cut to length, peeled, or split" — the types of trees transported by defendants' "motor vehicles" — *are* among the "agricultural or horticultural commodities" over which 49 U.S.C. § 13506(a)(6)(B) deprives the Secretary of Transportation of the jurisdiction to regulate "under this part" of the Motor Carrier Act,[75] but *only* "under this part."  The "part" referred to by Section

---

[75] *Compare*  49 C.F.R. § 372.115 (listing "trees – sawed into lumber" as not exempt under 49 U.S.C. 13506(a)(6)) *with* U.S. Department of Transportation, Federal Motor Carrier Safety Administration, Administrative Ruling No. 119 (Apr. 1, 2014) (listing "Trees" that have been "Cut to length, peeled, or split" as "Exempt-Law," but trees that have been "Sawed into lumber" as "Not exempt-Law").

13506(a)(6) defines the authority of the Department of Transportation to issue economic, licensing, and reporting regulations. *See, e.g.*, 49 U.S.C. §§ 13701-13713 (Rates and Through Rates); §§ 13901-13909 (Registration); §§ 14101-14123 (Operations of Carriers); §§ 14301-14303 (Finance).

Motor vehicles transporting agricultural or horticultural commodities are exempt from economic, licensing, and reporting regulations by the Secretary of Transportation because the exemption was originally "designed to preserve for the farmers the advantage of low-cost motor transportation." *East Texas Motor Freight Lines, Inc. v. Frozen Food Express*, 351 U.S. 49, 53 (1956).

Even so, 49 U.S.C. § 13506(a)(6)(B) does not exempt motor vehicles that transport agricultural or horticultural commodities from the Motor Carrier Act's *safety regulations*, including maximum hour of work requirements. *See American Trucking Associations v. United States*, 344 U.S. 298, 330 (1953) ("Except as to certain safety requirements [49 U.S.C. § 13506(a)(6)(B)] exempts from regulation motor vehicles of farmers and farm cooperatives used for farm purposes.") (Black, J., dissenting) (alteration supplied).

Indeed, the phrase "under this part" is an all important key for unlocking the Congressional intent undergirding 49 U.S.C. § 13506, as the Eleventh Circuit observed in *Walters v. American Coach Lines of Miami, Inc.*, 575 F.3d 1221 (11th

Cir. 2009).  That opinion held that a jurisdictional limitation listed in 49 U.S.C. § 13506 did not eliminate the Secretary of Transportation's "authority to regulate maximum hours."  *Id*. at 1233.  In reaching that conclusion, the Eleventh Circuit found the rationale of the Second Circuit when analyzing a related, but different statutory provision in the same Part of the Code — *i.e.*, 49 U.S.C. § *13505* — to be persuasive.  *See Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F.3d 217 (2d Cir. 2002).  That opinion examined the following statutory language:

> Neither the Secretary [of Transportation] nor the [Surface Transportation] Board has jurisdiction *under this part* over the transportation of property by motor vehicle when — (1) the property is transported by a person engaged in a business other than transportation; and (2) the transportation is within the scope of, and furthers a primary business (other than transportation) of the person.

49 U.S.C. § 13505(a) (alterations and emphasis supplied); *see also Bilyou*, 300 F.3d at 225.  The Second Circuit reasoned that the qualifier-phrase, "under this part," served to confine Section 13505's limitation on the Secretary's jurisdiction to the *economic regulations* listed in that part of the Motor Carrier Act in which Section 13505 was codified, and did not remove the Secretary's authority to prescribe maximum hour requirements under a different part of the same Act that dealt with the safety of the operations of motor carriers.  *See Bilyou*, 300 F.3d at 225-29.

During the Second Circuit's evaluation of the Congressional intent

undergirding Section 13505(a) in *Bilyou*, the panel's opinion broke down each relevant section of the Motor Carrier Act. Title 49 of the United States Code contains ten subtitles. The subtitles relevant to this inquiry are Subtitle IV (addressing "Interstate Transportation") and Subtitle VI (addressing "Motor Vehicle and Driver Programs"). Part B of Subtitle IV contains the "agricultural or horticultural commodities" jurisdictional limitation at issue in this case (49 U.S.C. § 13506(a)(6)(B)), as well as those at issue in the Eleventh Circuit's opinion in *Walters* (49 U.S.C. § 13506(a)(8)(A)) and the Second Circuit's opinion in *Bilyou* (49 U.S.C. § 13505(a)). Part B of Subtitle IV also addresses the authority for the Department of Transportation to issue economic, licensing, and reporting regulations. *See, e.g.*, 49 U.S.C. §§ 13701-13713 ("Rates and Through Rates"); §§ 13901-13909 ("Registration"); §§ 14101-14123 ("Operations of Carriers"); and §§ 14301-14303 ("Finance"). The section that is relevant to the Motor Carrier Act exemption to the FLSA — *i.e.*, 49 U.S.C. § 31502, vesting the Secretary of Transportation with the authority to prescribe maximum hour requirements — is found in an entirely different part of the Act from the jurisdictional exemptions. It is found in Part B of Subtitle VI, which grants the Secretary of Transportation the authority to regulate the safety of operations by motor carriers.

The Second Circuit's opinion in *Bilyou* held that the mere fact that the

jurisdictional limitation prescribed in 49 U.S.C. § 13505(a)

> denies the Secretary [of Transportation] power to prescribe *economic and licensing regulations* of the sort covered in Subtitle IV, Part B [of the Motor Carrier Act], *in no way contradicts the Secretary's authority*, *established in a different part of the Motor Carrier Act*, to set qualifications and maximum hours of service for drivers to promote *safety of operations*.

*Bilyou*, 300 F.3d at 226 (alterations and emphasis supplied). That power — "to set qualifications and maximum hours of service for drivers [of motor vehicles] to promote *safety of operations*" — is the authority relevant to the Motor Carrier Act exemption to the FLSA. *See* 29 U.S.C. § 213(b)(1).

The Eleventh Circuit's opinion in *Walters v. American Coach Lines of Miami*, *supra*, agreed with the Second Circuit's analysis in *Bilyou*, and added: "More importantly, the [Department of Transportation's] own regulations define 'exempt motor carriers' as those exempt from economic regulation under § 13506 but still subject to safety regulations, such as maximum hours laws." *Walters*, 575 F.3d at 1233 (citing 49 C.F.R. § 390.5) (alteration supplied). Two other circuit courts have followed the same statutory analysis. *See Almy v. Kickert School Bus Line, Inc.*, 722 F.3d 1069, 1071-74 (7th Cir. 2013); *Klitzke v. Steiner Corp.*, 110 F.3d 1465, 1468-69 (9th Cir. 1997).

The bottom line on the contention of plaintiff's counsel that the "agricultural

or horticultural commodities" jurisdictional limitation specified in 49 U.S.C. § 13506(a)(6)(B) divested the Secretary of Transportation of the power to regulate the qualifications and maximum hours of service of employees of motor carriers like defendants is this:   He is wrong.   For reasons of safety, the Secretary of Transportation possesses the authority to limit the number of hours of persons who operate and maintain motor vehicles owned by motor carriers like defendants who, for compensation, transport products owned by others over the public highways in interstate commerce. *See* 49 U.S.C. § 31502(b)(1).[76] That authority generally extends to employees other than drivers — to employees whose work activities affect the safety of that driving, like the employees who load the motor vehicles, and the mechanics who maintain them.[77]  There is no indication that Congress intended to limit the power of the Secretary of Transportation to regulate those employees' hours by the character of the goods that are conveyed over public highways in interstate commerce.  Circuit courts also have not interpreted the statute to limit the Secretary's

---

[76] The statute cited in text addresses motor carrier and private motor carrier requirements, and provides that:   "The Secretary of Transportation may prescribe requirements for . . . (1) *qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier*; . . ."  49 U.S.C. § 13502(b)(1) (emphasis supplied).  *See also* Hours of Service of Drivers, 76 Fed. Reg. 81,134 (Dec. 27, 2011) (to be codified at 49 C.F.R. pts. 385, 386, 390, and 395).

[77] *See* 29 C.F.R. § 782.2(a)(1) (activities that affect the safety include the work of drivers, driver's helpers, loader, and mechanics); *see also Walters*, 575 F.3d at 1226 ("[T]he Secretary of Transportation does not have to exercise the authority granted to him by the [Motor Carrier Act] for the motor carrier exemption to be applicable; instead, his power to regulate under the act merely needs to cover a particular group of employees.") (alterations supplied).

authority to regulate maximum hours by the type of goods transported.  Instead, they have found that the jurisdictional limitations on the Secretary's authority to prescribe economic and licensing regulations do not extend to the Secretary's authority to enact safety regulations.

Significantly, and in addition to all that has been said in this part of the opinion, plaintiff's counsel abandoned this argument at oral argument, recognizing that the Eleventh Circuit precedent dictated the court's ruling on this issue.

Accordingly, the court concludes that defendants satisfied the first *prima facie* element of their contention that, during all periods that plaintiff was their "employee," he was employed by a "motor carrier" subject to the jurisdiction of the Secretary of the Department of Transportation.

> **b.** **Second *prima facie* element**:  *Did plaintiff's work activities directly affect the safe operation of defendants' motor vehicles?*

Defendants also must prove a second *prima facie* element:  that plaintiff was engaged in work activities of a character that directly affected the safety of the operation of motor vehicles used to transport for compensation property owned by others over public highways in interstate transportation.  *See* 29 C.F.R. § 782.2(a);[78] *Baez*, 938 F.2d at 182.

Only certain classes of employees are considered to be engaged in work

---

[78] See note 71, *supra* (explicating 29 C.F.R. § 782.2(a)).

activities that directly affect the safe operation of motor vehicles in the transportation on the public highways of passengers or property (or both) in interstate commerce within the meaning of the Motor Carrier Act. These include drivers, driver's helpers, loaders, and mechanics. *See* 29 C.F.R. § 782.2(b)(1). If an employee serves in one of those positions and is "called upon in the ordinary course of his work to perform, either regularly or *from time to time*, safety-affecting activities . . . , he comes within the exemption in all workweeks when he is employed at such job." 29 C.F.R. 782.2(b)(3) (emphasis and ellipsis supplied). That rule applies regardless of the proportion of the employee's time that is spent doing work affecting the safety of operation of motor vehicles, *unless* those safety-affecting duties "are so trivial, casual, and insignificant as to be de minimis." *Id.* Courts consistently define *de minimis* to mean less than one percent. *See Oddo v. Bimbo Bakeries U.S.A., Inc.*, 391 F. Supp. 3d 466, 473-74 (E.D. Pa. 2019) (collecting cases).

Plaintiff argues that any work performed by him which affected the safety of defendants' road trucks or wood trailers was minimal. Even though such work may not have been a significant portion of the duties performed by plaintiff, the evidence supports a finding that his safety-affecting work was more than *de minimis*.

Plaintiff testified that his primary role as an employee of defendants was as a mechanic, but he estimated that less than five percent of that work was performed on

defendants' road trucks or wood trailers because they "kept real good trucks and real good trailers."[79]  Plaintiff testified that most of the mechanic work that affected the safety of defendants' road trucks and trailers was performed by Bill Ragan, another but part-time mechanic, whose employment with defendants ended in June 2017.[80]

Plaintiff admitted during deposition that he "greased" the trucks about once a week, and that, while doing so, he also could inspect them for potential issues by checking the tires and looking for oil leaks on the brakes.[81]  Greasing and oiling the trucks do not count as safety-affecting activities, *see* 29 C.F.R. § 782.6(c)(1), but inspecting the tires and brakes and repairing them as needed is an example of safety-affecting work.  *See* 29 C.F.R. § 782.6(a).[82]  Counsel for both parties spent much time during oral argument disagreeing about whether the fact that plaintiff couldn't "help but see"[83] the tires, brakes, or steering mechanism when he was oiling or greasing the trucks counted as "inspecting" the vehicles and, thus, performing safety-affecting work.  Even ignoring those potential inspections, the written evidence of the work plaintiff performed, shows that more than a *de minimis* amount was safety-affecting

---

[79] Doc. no. 46-1 (Plaintiff's Exhibit A - Jeremy Minor Deposition), at 53-54.

[80] *Id.* at 65-66; doc. no. 43-8 (Defendants' Exhibit G - Bill Ragan Affidavit), ¶ 2.

[81] *See* doc. no. 46-1 (Plaintiff's Exhibit A - Jeremy Minor Deposition), at 66-67.

[82] Safety-affecting activities generally include:  "The inspection, repair, adjustment, and maintenance for safe operation of steering apparatus, lights, brakes, horns, windshield wipers, wheels and axles, bushings, transmissions, differentials, motors, starters and ignition, carburetors, fifth wheels, springs and spring hangers, frames, and gasoline tanks."  29 C.F.R. § 782.6(a).

[83] Doc. no. 46-1 (Plaintiff's Exhibit A - Jeremy Minor Deposition), at 347.

work performed on road trucks or trailers.

To calculate an estimate of the amount of safety-affecting work plaintiff performed, the court reviewed plaintiff's time logs from June 20, 2016 through mid-April 2017.[84] The descriptions in those records showed that plaintiff performed "from time to time" safety-affecting work on defendants' road trucks and trailers, including changing tires and brakes.[85]  Plaintiff also had records of fixing lights on a trailer,[86] repairing an air leak on one of the road trucks,[87] and working on the starter of one of the road trucks.[88]

In order to calculate from those records an approximate percentage of time that plaintiff spent performing that safety-affecting work, the court added the number of days plaintiff recorded that he performed clearly safety-affecting work on a road truck or trailer (27)[89] and divided by the total number of days for which plaintiff had

---

[84] *See* doc. no. 58-1 (Plaintiff's Exhibit K - Time Log).

[85] *See, e.g.*, *id.* at 7 ("replaced brake chamber on #5 trailer, changed tire on #5 trailer, fixed flat tires"); *id.* at 8 ("put brakes on trailer," and "fixed lights on trailer"); *id.* at 9 ("changed flat on trailer"); *id.* at 20 ("fixed flats, mounted tires," "fixed one flat and replaced one blowout on trailer," and "fixed air bag on truck, aired all tires"); *id.* at 23 ("adjusted brakes on #4 trailer").

[86] *Id.* at 8 ("fixed lights on trailer").

[87] *Id.* at 18 ("worked on air leak on blue truck" and "fixed air leak on blue truck"); *id.* at 25 ("fixed air leak on white truck"); *id.* at 26 ("fixed air leak on truck").

[88] *Id.* at 44 ("worked on blue mack (starter)").

[89] The following citations are to each activity the court included in its calculation:  doc. no. 58-1 (Plaintiff's Exhibit K - Time Log), at 7 ("replaced brake chamber on #5 trailer, changed tire on #5 trailer, fixed flat tires"); *id.* at 8 ("put brakes on trailer," and "fixed lights on trailer"); *id.* at 9 ("changed flat on trailer"); *id.* at 12 ("put engine together and put back on truck"); *id.* at 14 ("changed tires on Blue Mack"); *id.* at 15 ("worked on trailer dolly legs"); doc. no. 58-1 (Plaintiff's

detailed records (228), then multiplied that number by 100 to find a percentage.[90]  The result was approximately twelve percent.

Additionally, all of the other witnesses whose testimony the court considered estimated that at least twenty-five percent of plaintiff's work directly affected the safety of the operation of motor vehicles driven on public highways in interstate commerce.[91]

Neither plaintiff nor any of the other witnesses have testified that the nature of plaintiff's work changed substantially after he stopped recording the descriptions of the work he performed.  In fact, Bill Ragan, defendants' only other mechanic, left a few short months after the descriptions of plaintiff's work ceased.[92]  Based on these written records and the fact that plaintiff was the sole mechanic for most of his

Exhibit K - Time Log), at 18 ("worked on air leak on blue truck, serviced white truck," and "fixed air leak on blue truck"); *id.* at 20 ("fixed flats, mounted tires," "fixed one flat and replaced one blowout on trailer," and "fixed air bag on truck, aired all tires"); *id.* at 23 ("adjusted brakes on #4 trailer"); *id.* at 25 ("changed equalizer on trailer," and "fixed air leak on white truck"); *id.* at 26 ("changed trailer tire, fixed air leak on truck"); *id.* at 28 ("changed tire on truck"); doc. no. 58-1 (Plaintiff's Exhibit K - Time Log), at 29 ("fixed trailer" and "flat tires"); *id.* at 30 ("brake job and seal on trailer #5"); *id.* at 36 ("fixed bumper on truck"); *id.* at 38 ("changed steer tire on truck" and "welding on trailer #10"); *id.* at 41 ("fixed flat on Blue Mack"); *id.* at 42 ("put parts on white & green mack" and "changed 8 tires"); doc. no. 58-1 (Plaintiff's Exhibit K - Time Log), at 43 ("changed tires on trailer"); *id.* at 44 ("worked on blue mack (starter)").

[90] The court's calculation was conservative: it did not count days where the description was vague, like "worked on trailer," nor did it count other arguably safety-affecting work on "loaders."

[91] *See* doc. no. 43 (Defendants' Exhibit A - Travis Brown Affidavit), ¶ 24; doc. no. 43-8 (Defendants' Exhibit G - Bill Ragan Affidavit), ¶ 7; doc. no. 43-9 (Defendants' Exhibit H - Trent Anthony Affidavit), ¶ 8.

[92] *See* doc. no. 43-8 (Defendants' Exhibit G - Bill Ragan Affidaivt), ¶ 2 (stating that he stopped working for defendants in June 2017).

employment, the court can reasonably, even conservatively, infer that the safety-affecting work plaintiff performed was much more than the one percent *de minimis* threshold.[93]

Accordingly, defendants satisfied the second *prima facie* requirement for establishing the Motor Carrier Act exemption to the FLSA.

### 2.    Does the "Small Vehicle Exception" to the Motor Carrier Act exemption apply?

That is not the end of discussion, however.  Plaintiff also argues that he falls under the "Small Vehicle Exception" to the Motor Carrier Act exemption.  That "Exception" applies only to those employees whose work as a driver, driver's helper, loader, or mechanic, in whole *or in part*, affected the safety of motor vehicles weighing 10,000 pounds or less when in transportation on the public highways in interstate commerce.  The requirement for "in part" is more than *de minimis*. *See Oddo*, 391 F. Supp. 3d at 471.  Plaintiff has the burden of proving that the exception applies. *See Carley v. Crest Pumping Technologies, LLC*, 890 F.3d 575, 579-80 (5th Cir. 2018).

Congress changed the scope of the Motor Carrier Act exemption in August 2005, by enacting the Safe, Accountable, Flexible, Efficient Transportation Equity

---

[93] The court is allowed to make reasonable inferences in favor of the non-moving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Act:  A Legacy for Users ("SAFETEA-LU"), *see* SAFETEA-LU, Pub. L. No. 109-59,

§ 4142(a), 119 Stat. 1144, 1747 (2005), and then later enacting the SAFETEA-LU

Technical Corrections Act of 2008, *see* Pub. L. No. 110-244, 122 Stat. 1572, 1620

(2008).  The latter statute created the so-called "Small Vehicle Exception" to the

Motor Carrier Act exemption for those "covered employees" who are:

(1)   . . . employed by a motor carrier . . . ;

(2)   whose work, in whole or in part, is defined —

   (A)   as that of a driver, driver's helper, loader, or mechanic; and,

   (B)   as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce . . . ;

(3)   who performs duties on motor vehicles weighing 10,000 pounds or less.

SAFETEA-LU Technical Corrections Act of 2008, Pub. L. No. 110-244, § 306(c),

122 Stat. 1572, 1621 (2008).[94]

Plaintiff argues that the Small Vehicle Exception should apply to him because

he performed some of his safety-affecting mechanic work on "small vehicles."  There

were five possible small vehicles that plaintiff used in his work for defendants:  four

---

[94] The Department of Labor has indicated that the exception applies on a week-by-week basis. *See* U.S. Department of Labor, Wage & Hour Division, Fact Sheet #19 (Nov. 2009) (stating that the Motor Carrier Act exemption does not apply in "such work weeks" when the employee is performing work affecting the safety of vehicles covered by the Small Vehicle Exception even when he or she is also performing work affecting vehicles weighing greater than 10,000 pounds).

Toyota Tacomas owned by defendant Travis Brown, and one Dodge 3500 owned by plaintiff.[95]  Travis Brown could only recall one time that plaintiff performed mechanic work that affected the safety of one of the Toyota Tacomas, and one time when plaintiff drove one of those trucks to pick up parts he needed for work.[96]  In response to defendants' interrogatories, plaintiff provided a list of six occasions on which he allegedly drove one of the Toyotas to pick up supplies for his work with defendants, but all of those events occurred prior to April 27, 2017:  the date on which plaintiff became an employee.[97]  During deposition, plaintiff mentioned a few times he hauled hay and some equipment for defendants.[98]  Plaintiff and defendants agree, however, that none of the small vehicles were used to transport passengers or property across state lines for anyone other than defendants.[99]

There is no binding precedent that directs this court on whether plaintiff's trips to pick up supplies for his mechanical work for defendants makes him a driver of a

---

[95] *See* doc. no. 46-1 (Plaintiff's Exhibit A - Jeremy Minor Deposition), at 95-96 (stating that he used his own Dodge 3500 occasionally on the job); *id.* at 107-09 (discussing the four Toyota Tacomas).

[96] *See* doc. no. 43 (Defendants' Exhibit A - Travis Brown Affidavit), ¶ 27.

[97] *See* doc. no. 53-11 (Plaintiff's Exhibit 11 - Plaintiff's Response to Interrogatories), at 10-12; *see also* doc. no. 46-1 (Plaintiff's Exhibit A - Jeremy Minor Deposition), at 240 (stating that he sometimes used his Dodge 3500 to haul hay, other trucks, and small buildings).

[98] *See* doc. no. 46-1 (Plaintiff's Exhibit A - Jeremy Minor Deposition), at 95, 240, 339, 360-61.

[99] *See* doc. no. 43 (Defendants' Exhibit A - Travis Brown Affidavit), ¶¶ 26-28; doc. no. 46-1 (Plaintiff's Exhibit A - Jeremy Minor Deposition), at 84-86, 95-99, 107-10, 331, 341; *id.* at 109 (stating that the four Toyota Tacomas were never used to haul property across state lines).

small vehicle in interstate commerce as required for the Small Vehicle Exception, and the district courts that have addressed the issue have decided the question differently. *Compare, e.g.*, *Garcia v. Western Waste Services, Inc.*, 969 F. Supp. 2d 1252, 1261 (D. Idaho 2013) (holding that the plaintiff's act of driving a small vehicle solely to repair company vehicles did not qualify as interstate commerce) *with Pye v. Oil States Energy Services, LLC*, 233 F. Supp. 3d 541, 554-56 (W.D. Tex. 2017) (finding that "transporting necessary tools and equipment to/from customers' well sites and [transporting employees] between the hotel/man camp and the well site" with small vehicles constituted work performance); *Roche v. S-3 Pump Service, Inc.*, 154 F. Supp. 3d 441, 447 (W.D. Tex. 2016) (weekly deliveries of supplies that "flow" in interstate commerce counts as driving a motor vehicle in interstate commerce for the purposes of the Small Vehicle Exception).

This court finds the decision of the District of Idaho in *Garcia v. Western Waste Services*, *supra*, to be the most persuasive. There, the district court found that the plaintiff only drove small vehicles in order to repair larger company vehicles, and that he "did not transport property as a driver of a service vehicle or provide services to customers." 969 F. Supp. 2d at 1261. Based upon those facts, the court held that the plaintiff's activities with the small vehicles did not qualify as interstate commerce. *Id*. The plaintiff in the present case performed similar duties with small vehicles,

36

mostly picking up supplies or hauling products solely for his employer. Accordingly, his work activities with small vehicles did not relate to interstate commerce.

Because none of the "small vehicles" were used in interstate commerce, the Small Vehicle Exception to the Motor Carrier Act exemption does not apply. Plaintiff is, therefore, subject to the Motor Carrier Act exemption, and is not entitled to claim overtime pay under the FLSA.

## IV. CONCLUSION

Plaintiff is subject to the Motor Carrier Act exemption to the FLSA, and is not entitled to overtime pay under the latter statute. Accordingly, plaintiff's motion for summary judgment is due to be denied, and defendants' motion for summary judgment is due to be granted. A separate Judgment consistent with this memorandum opinion will be entered contemporaneously herewith.

**DONE** this 23rd day of March, 2021.

_____

Senior United States District Judge